# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LILA PECK,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNION PACIFIC RAILROAD CO. and UNITED TRANSPORTATION UNION DISCIPLINE INCOME PROTECTION PROGRAM,<br><br>　　　　Defendants. | Case No. 4:13-cv-00345-BLW<br><br>MEMORANDUM DECISION AND ORDER |

Before the Court are the following motions: (1) Defendant Union Pacific Railroad Co.'s Motion for Summary Judgment (Dkt. 38); and (2) Plaintiff Lila Peck's three motions to strike (Dkts. 39, 41, and 45). The Court heard oral argument on January 15, 2015, and took the matter under advisement. For the reasons set forth below the Court will (1) deny Peck's motions to strike, (2) grant the Motion for Summary Judgment with regard to Peck's disparate treatment claim, and (3) deny the Motion for Summary Judgment with regard to Peck's retaliation claim.

## BACKGROUND

Plaintiff Lila Peck claims she was retaliated against at her job for participating in an EEO investigation and ultimately fired because she is a woman. She has sued her

**MEMORANDUM DECISION AND ORDER - 1**

employer, Union Pacific. She brings claims for retaliation and disparate treatment under Title VII.

Peck started training to become a Union Pacific Train Service employee in Pocatello, Idaho on June 6, 2011. *Pl's SUF* ¶ 2, Dkt. 40. She was part of a training class of ten. *Id.* She was the only female member of the training class. *Id.* As a trainee, Peck was not considered an official employee. All trainees must first complete a 60-day "probationary period" before becoming an employee and earning the right to obtain union benefits. *Def's SOF* ¶ 2, Dkt. 38-1.

On August 5, 2011, Peck overheard a vulgar conversation concerning strip clubs initiated by a classmate, Jason Martin. *Pl's SUF* ¶ 4. Two other trainees, Dave Williams, and Clint Knickrehm, also participated in the conversation. *Id.* Peck did not report the incident to Union Pacific's EEO compliance office, but an instructor named Jerome Kasczinski did. *Id.* A few days after the incident, Carol Gleason from the EEO Department called Peck and asked her if she knew anything about the strip-club conversation. Peck, fearing she would lose her job if she did not talk, told Ms. Gleason the names of those who participated in the conversation and what each participant said during the conversation. *Def's SOF* ¶ 7, Dkt. 38-1. As a result of the conversation, Jason Martin's job application was rejected. *Id.* ¶ 8.

Following Jason Martin's rejection as a job applicant, Peck's fellow trainees, Dave Williams, Clint Knickrehm, and Todd Aslett gave Peck "the cold shoulder." *Id.* ¶ 9. Specifically, Peck said that Todd Aslett "glared daggers" at her on two occasions; Clint

Knickrehm shouted, "Yeah, we don't want any EEO violations here" before an EEO training video; and other Union Pacific employees avoided her and asked her whether she turned Jason Martin in for his vulgar conversation. *Id.*

On August 16, 2011, a couple of weeks after Peck overhead this conversation, she was placed on furlough because of a downturn in the economy. *Id.* ¶ 12. Peck had hoped the whole matter would "just blow over" while she was on furlough. *Peck Dep.* 82:20-25, Dkt. 40-4. But when Peck returned to work nearly a year later, in July 2012, people at the railroad continued to question her about the incident. *Id.* at 83:20-88:24. And, according to Peck, her supervisors did nothing to dispel the belief that Peck was somehow responsible for Jason Martin being fired. *Pl's SUF* ¶ 8. In fact, Peck says that the manager of Railroad Operations, Gary Pfinster, actually led others to believe that Peck had turned Jason Martin into the EEO Compliance office. *Id.* And in the context of a return to work class, Pfinster made comments and tolerated comments that insinuated that Peck had snitched on Jason Martin. *Id.*

Finally, tired of the perceived harassment, Peck called the Union Pacific Values Line to complain on October 30, 2012. *Id.* ¶ 7. In her complaint, Peck apparently not only implicated her peers in the harassment but also accused two superiors, Gary Pfinster and Jack Huddleston, of contributing to the harassment. *Id.* ¶ 9. However, before anything could be done about her Values Line complaint, Peck was involved in a derail incident.

The derail incident occurred on November 5, 2012. Union Pacific had assigned Pack to work as a student trainee with a crew in Idaho Falls. *Pl's SUF* ¶ 10. It was her

first night working with this crew. *Id.* Matthew K. Wilson was the conductor in charge of the work, and he had apparently heard from random employees that he should be careful in the way he talked or behaved around Peck. *Id.* At the start of the shift, Wilson told Peck to just observe and see what they do on the job. *Id.*

Peck maintains that the Idaho Falls crew was the worst crew she had worked with. *Id.* ¶ 11. The crew constantly broke rules, such as jumping off a moving locomotive, throwing a switch when cars were still moving, stopping too close to a switch and failing to observe proper red zones. *Id.* Peck objected, but Wilson told her that they liked to hurry and get the job done and she should ignore their safety violations. *Id.*

At approximately 8:05 p.m. a collision and derailment occurred in the "malt yard" south of Idaho Falls. *Id.* ¶ 12. The crew's locomotive and one car were backing south off the main line to pick up some cars. *Id.* As the locomotive and car approached the 411 switch, Wilson told the engineer to stop, but he jumped off the car while it was still moving. *Id.* Peck, however, waited for the car to stop before jumping off, and by the time she climbed off the car and had gone around to the end of the car, Wilson had already thrown the 411 switch and was hurrying up the line of switches toward the cars they intended to pick up. *Id.* Peck tried to keep up with Wilson but she had not yet caught up when she heard him radio the engineer to back up. *Id.* The engineer apparently backed up at an excessive rate of speed, and Wilson had thrown the 411 switch the wrong way. *Id.* This caused the locomotive and car to back into a line of cars on the 411 siding, which

derailed and damaged a car. *Id.* Wilson admitted he threw the switch the wrong way. *Id.* He admitted responsibility for the derailment. *Id.*

At the time of the derailment, Peck had completed her training but had not yet completed her 60-day probationary period. So she was not yet an official Union Pacific employee.

On November 7, 2012, Gary Pfinster and Ricky Wells decided that Peck's job application should be rejected. *Pl's SUF* ¶ 13. Pfinster called Melissa Schop of the Union Pacific EEO office seeking immediate approval of his decision to reject Peck's application. *Id.* Melissa Schop memorialized the conversation in an email to Carol Gleason, and Pfinster admitted it was accurate. *Id.* The email specifically mentioned that Peck had filed a previous EEO complaint:

> Carol,
>
> Gary called me earlier today looking for approval for a probationary termination. He couldn't reach you and was looking for an immediate decision. Lila Peck is a Switchman in Pocatello. My understanding is she has filed a previous EEO complaint. She recently had a major rules violation. They are disciplining the conductor who was also involved. She has other performance problems as well. She has previously failed a rules exam. She has not yet qualified as a Conductor and is the last in her class to do so. There is also another employee who has violated the same rule. Gary is currently checking if he is within his probationary period. If so, he will also be terminated. If not, he will be disciplined.
>
> I gave my ok for the termination. Let me know if you have any questions.

*Nov. 8, 2012 Email from Melissa Schop to Carol Gleason*, Dkt. 40-5 at 46. The rules Pfinster said Peck had broken were Rules 6.5 and 8.2. *Id.* at ¶ 13. Rule 6.5 deals with shoving movements, and rule 8.2 deals with switching. *Id.*

**MEMORANDUM DECISION AND ORDER - 5**

Three other Union Pacific employees, including Wilson were involved in the derailment. Engineer Layne W. Clark was operating the locomotive at an excessive rate of speed at the time of impact, and Brakeman Marvin L. Dixon was present at the time of the derailment. *Id.* ¶¶ 28-29. All three were charged in the incident. The charges were identical for each:

> You allegedly failed to ensure switches were properly aligned prior to making a shoving movement and failed to control shoving movement by not being prepared to stop within half the range of vision for switch aligned improperly, resulting in collision with standing equipment causing derailment and damage to company property.

*Id.* ¶ 30.

Wilson admitted responsibility for the derailment and was disciplined by having to take five days of paid training. The charges against Clark were waived. The charges against Dixon were dropped. *Id.* ¶ 31.

On November 9, 2012, Union Pacific sent Peck a letter rejecting her application for employment. *Wells Letter*, UPPR's Ex. I, Dkt. 26-9. At his deposition, Pfinster testified that it is "standard practice" to terminate the employment of employees who are still on probation and who are "involved" with serious rule violations. Pfinster defined "involved" as simply being there or "on the ground." *Pl's SUF* ¶ 19. Neither Wells nor Pfnister knew that Plaintiff had called the Values Line to complain before the decision was made to reject her application. *Id.* ¶ 27. But they both knew that Peck had participated in the EEO investigation that led to Jason Martin's termination.

Peck alleges that Union Pacific rejected her application in retaliation for her participation in the EEO investigation relating to the strip-club comments and her later Values Line complaint. She also claims she was disparately treated due to her gender as the only woman on the crew who did not continue working at Union Pacific following the derail incident. Peck brings claims for retaliation and disparate treatment based on gender. Union Pacific moves for summary judgment on each of her claims.

## ANALYSIS

### 1. Motions to Strike

Peck moves to strike various defense exhibits, including her own deposition, as well as Pfinster's deposition, in addition to various other documents, because they are not properly authenticated or because they are hearsay. At the summary judgment stage, the Court does not focus on the admissibility of the evidence's form. It instead focuses on the admissibility of its contents. *Block v. City of Los Angeles,* 253 F.3d 410, 418–19 (9th Cir.2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."); *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.,* 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") (internal quotation marks and citation omitted). The Court finds that all of the exhibits Peck seeks to strike could be presented in an admissible form at trial.

In addition, Peck seeks to strike Union Pacific's Exhibit F, arguing that it is irrelevant. Exhibit F is a Public Law Board document, which affirms Union Pacific's decision to reject the application of Casey Allen, an employee with a very similar employment history to Peck's. The Court, however, did not consider this document in deciding Union Pacific's summary-judgment motion, so this particular issue is moot.

The Court will otherwise deny Peck's motions to strike.

## 2. Retaliation

Peck claims she was harassed and ultimately fired because she participated in the EEO investigation that led to the termination of a fellow classmate and because she made an EEO report. In order to prevail on a retaliation claim, a plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in a protected activity, (2) she was subjected by her employer to adverse employment action, and (3) a causal link exists between the two. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982). "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Id.*

Peck presents no evidence that either Pfinster or Wells knew that she had made a Values Line complaint. Without evidence that the terminating managers were aware that Peck had made the Values Line complaint, Peck cannot establish a causal link between her Values Line complaint and the decision to reject her employment action. *Id.* She therefore cannot rely on the Values Line complaint to establish her prima facie case of retaliation.

**MEMORANDUM DECISION AND ORDER - 8**

Peck, however, also participated in an EEO investigation, which also qualifies as protected activity. Peck participated in this investigation in August 2011, but she was not terminated until November 2012. Union Pacific therefore argues that Peck cannot show a causal link between her participation in the EEO investigation and the rejection of her employment application because more than a year passed between the two events.

But temporal proximity between the protected activity and the adverse employment action is not the only way to prove causation. Evidence of a pattern of retaliatory conduct can be very persuasive evidence of retaliatory motive. Here, Peck has submitted evidence suggesting that the allegedly retaliatory conduct began as soon as she was forced to participate in the EEO investigation, and it continued until her employment application was rejected. Indeed, even though there is no proof Pfinster or Wells knew about the Values Line complaint, the fact Peck made the complaint shows that she, at the very least, felt that Pfinster, as well as others, were retaliating against her because she participated in the EEO investigation of Jason Martin, and this alleged retaliation continued up until her termination.

Just as importantly, Pfinster mentioned Peck's participation in the EEO investigation in his conversation with Melissa Schop regarding the reasons for Peck's discharge. Although Pfinster defends his mentioning of Peck's conduct to ensure that Peck's termination would not run afoul of any rules, regulations, or statutes, a reasonable juror could conclude that Pfinster factored in Peck's protected activity when deciding to

reject her employment application. At the very least, his mentioning Peck's EEO conduct demonstrates her participation in the EEO investigation was not forgotten.

Given these circumstances, the Court finds that questions of fact exist on Peck's retaliation claim, and will therefore deny summary judgment on that claim.

3. **Disparate Treatment**

Peck also alleges that she was terminated because of her gender. To establish a prima facie case of disparate treatment under Title VII, Peck must show that she (1) belongs to a protected class, (2) was qualified for her position, (3) was subject to an adverse employment action, and (4) similarly-situated male employees were treated more favorably. *Davis v. Team Elec. Co*., 520 F.3d 1080, 1089 (9th Cir. 2008).

Three men and one woman – Peck – were involved in the derail incident that led to the rejection of Peck's employment. But only Peck, the sole female member of the crew, lost her job because of the derailment. At first glance, it therefore appears that Peck has established a prima facie case. Union Pacific, however, responds that Peck was not similarly situated to the other male employees because she was a probationary employee while the men involved were union employees.

Individuals are similarly situated for purposes of a Title VII discrimination claim when "they have similar jobs and display similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir.2003). The "employee's roles need not be identical; they must only be similar in all *material* respects." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir.2010) (emphasis added) (internal citations omitted).

The record in this case demonstrates that Peck was performing the same or similar work to the other three members of the crew and was "involved" in the derailment to the same extent as the other crew members in that "she was there," but only she lost her job while the male employees only received minimal discipline. However, the facts also demonstrate that Peck was a probationary employee-in-training and therefore could be terminated for any reason. By contrast, the other crew members were union employees and were entitled to certain protections under the collective bargaining agreement, which Peck did not enjoy. Because of this key distinction between Peck and the other crew members, the Court finds that Peck and the other crew members were not similar in all material respects. *See Moran v. Selig*, 447 F.3d 748, 756 n. 14 (9th Cir.2006) (stating Plaintiffs were not similarly situated in all material respects to employees who had worked long enough to qualify for benefits).

Indeed, in an unpublished decision, the Ninth Circuit considered this very issue and expressly held that probationary employees are not similarly situated to permanent employees:

> Burgess, [the plaintiff], argues that the distinction between probationary and permanent employees is insignificant. Case law, however, supports the contrary conclusion (citing cases holding probationary employees not similarly situated to permanent employees).
>
> "[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." [Citation omitted]. Burgess, however, presented no evidence that similarly situated probationary employees outside of his protected class were treated differently. Rather, the evidence he presented to the district court concerned permanent employees, who were not similarly situated to Burgess. Burgess failed to present a prima facie case of

disparate treatment and the district court properly entered summary judgment on that issue.

*Burgess v. State of Washington Dept. of Corrections*, No. 98-35417, 1999 WL 974182, *3 (9th. Cir. Oct. 22, 1999). As in *Burgess*, this Court finds that Peck, who was a probationary employee, has failed to present a prima facie case of disparate treatment. The Court therefore will enter summary judgment in favor of Union Pacific on Peck's disparate treatment claim.

## ORDER

**IT IS ORDERED that:**

1. Defendant Union Pacific Railroad Co's Motion for Summary Judgment (Dkt. 38) is GRANTED in part and DENIED to the extent indicated in this decision; and

2. Plaintiff Lila Peck's three motions to strike (Dkts. 39, 41, and 45) are DENIED.

DATED: March 3, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court